May it please the Court, Your Honor and Ms. O'Malley, I am Mike Esmeyer and I'm for the appellant Luis Cedillo-Narvaez and he will either be called Cedillo, he had a brother Juan Cedillo. If I'm mentioning Mr. Juan Cedillo, I'll either say Juan Cedillo or Juan. So otherwise if I say Cedillo or Mr. Cedillo or Luis, that's my client. And it's very important because the government says that these were the Cedillo brothers and this whole thing is the Cedillo brothers fault but it is clear from the PSR, from the interviews and from the evidence that Juan Cedillo was the instigator, the recruiter, the leader, the manager and that Luis Cedillo had a very limited point in all of this. He guarded some immigrants, illegal aliens who had been kidnapped from another coyote and taken to a safe house. So but the first point that I want to make to the Court is that so it is absolutely clear that in Gaul, the Supreme Court observed that a district court commits procedural error by improperly calculating the guidelines range. And that's what we're here about today is I believe that the judge, the district court erred in improperly calculating the guidelines range. As a result of an incorrect guidelines calculation, that will usually invalidate the sentence even when the district court chooses to impose a sentence outside the guideline range. This court in U.S. v. Iberra-Luna, Judge Hickenbotham, and in fact it was for the same district court judge, held that not only is that correct, in other words if the district court does not do the first thing it has to do, the first thing it has to do under the law is at sentencing determine the proper guideline range, the number, 42, 36, 31, the number. That, if done wrong, is cause for reversible error. Okay, but doesn't it matter whether it's plain error review or de novo review of the guidelines? Well, there's a lot of dispute in the present case as to what was plain error and what wasn't. No, I know that, but it makes a difference, right, to this whole analysis you just said. But I wonder. As to whether we would reverse based upon error, whether it's plain error review or some other standard of review. Although it's heresy, I sort of wonder if you can have plain error in an unreasonable sentence and it is an unreasonable sentence. Yeah, but that's your substantive challenge. You were just giving us an analysis of the procedural. So I was asking about the procedural challenge. Whether the guidelines were properly calculated. Whether as a matter of law, X can be a minor enhancement or Y can be a ransom and so on and so forth. Those are questions of law. But whether we review them de novo or plain error makes a difference, right? They are to be reviewed. Sentencing guidelines are to be reviewed de novo. That's Norse. United States versus Norse. Right. But. And again. Plain error applies if you didn't preserve the error. And then the question becomes not just if it was wrong, but was it clearly wrong. And then you have the other two prongs about affecting the rights and so on. Well, taking it to the point that I believe the court wants, we can look at the point over minor. The district court at sentencing said, I'm not sure this applies. The three points for minor. Because it is a kidnap for hire type situation that it was built for. And there is. There's a first circuit case that says that it's only involved in kidnap for hire. And it's not a person who's just temporarily put in charge, as Sadeo was, of food and harboring the victim. But the district court, sua sponte, said this is an appoint for appeal. And then we get in a dispute as this plain error argument goes. Because the judge said, take it up on appeal, and the defense lawyer said, yes, sir. Does that mean, yes, sir, I'm taking it, or I'm taking it up on appeal? So is that plain error or not plain error? I have two points over that issue. And I think that the court does look at whether or not it was objected to below. But I think you also have to look at the record. The record on that point is clear that the judge said, take it up on appeal. And here we are. I didn't say take it up on appeal. I said it might be a point for appeal. And here we are. Yes. OK. But the courts don't get to decide the standard of review for themselves, which is much appreciated, I'm sure. So what cases do you have that if a judge says something about the word appeal, then even though there was no objection, it somehow becomes not plain error, it becomes de novo or some other standard? I don't have a case. What I have is that from the language there, I believe that the lawyer objected. The judge said, you can take it up on appeal, and he said, yes, I will. He didn't say, I will. He said, yes, sir. And so I think that that is the same as I'm going to take it up on appeal. What else can one say in front of a judge who may have the power and did reduce the sentence significantly? And so I don't believe he was trying to get cross with the judge. I think he was trying, but he was trying to protect his right. And so I do believe on that particular point that we're not looking at plain error. So you think that's error preservation for the judge to say, this might be a point on appeal, and the lawyer to say, yes, sir, that preserves error? I think that . . . With no other objection having been made, no briefing, no citation to anything, no discussion, that's good enough? Without getting into the quality of the representation below, because that may be for another day, the judge sui sponte, and that's the issue. If I needed an issue, it is, can a judge sui sponte say, I'm preserving this error for you for appeal? And I think that the judge did. I think the judge said . . . Say that. The judge did not say, I'm sui sponte, preserving the error for you. The judge said, I'm not sure this applies, might be a point for appeal. Yes, sir. I'm asking, is that enough, without any embellishment on what everybody was thinking, to preserve error? And it's my position that it is, Your Honor. Okay. Well, but . . . And just in terms of the facts, when the judge brought it up, the judge referenced, didn't he, that he had sentenced the brother earlier that day? That's correct, Your Honor. And in that hearing, it was brought up. Is that right? I'm sorry? In that hearing, the issue was brought up in terms of whether or not that enhancement should apply. I was not present, and I do not have a copy of that, so I do not know. I cannot tell . . . All right. The judge did tell the defense lawyer, you were not present for earlier discussions today. That leaves me with the impression that, yes, sir, yes, Your Honor, that's exactly what occurred. However, I will say that the judge said, and I read it again this morning, this, I believe, may only apply to kidnap for hire, which is the situation that the First Circuit says it only applies to. Which leads me to the second point, which is another plain error issue. The defense lawyer, as to the six-point ransom, objected to the six-point ransom, but he objected mostly factually. We didn't ask for money to get your kin back. We asked for money for transportation, which comes from another case that the Fifth Circuit looked at in 2005. Our point here today, we believe that he preserved the error of the six-point on ransom, but our point here today is that it's an impermissible . . . adding the six points is impermissible because to compel is one of the elements. And this Court, in several cases, you don't look at the elements but the prerequisites. And so, the government points to Rivera Benito, and that was a case in which there was a paragraph. The defendant objected to the six points added for ransom to a hostage-taking situation. And the judge, the Fifth Circuit judge, but it's an unpublished case, no presidential value, said you get the six points because it's not an element of hostage-taking. That is, asking for money, or I won't release your kith and kin. So, but there are other cases from this very circuit, United States v. Abero Zelia, one I cited in the brief, United States v. De Jusus Batris. And what they look at, U.S. v. Calderon Lopez, what they look at is whether or not it is a prerequisite to compel another person to take action. And in fact, when the government laid out its facts for this sentence, the government said the U.S. proof was threatened to kill, injure, and continue to detain individuals in order to compel a third person to pay a sum of money as an explicit and implicit condition for the release of said individuals. If that's true, then the demand for money to compel action by the relatives, the third person, makes it a prerequisite to the crime. And as a prerequisite to the crime, it is an impermissible enhancement of an included characteristic of the offense, and therefore, as a prerequisite, you don't apply, additionally apply, the six-point addition. The argument is that the base level, 32, which is already six or seven points higher than the other categories. This indictment had a conspiracy on the harboring of illegal aliens and three counts of harboring of illegal aliens. Each one of those had a ten-year sentence, and it looked at sentencing guidelines, base levels of 24, thereabouts, 12 to 24. And the base level for hostage-taking is a 32. And why this defense lawyer pled this defendant, who has, even under the PSR, just average participation, to the most egregious of the offenses in the indictment. The government says it's because he didn't want to cooperate unless his brother cooperated, and his brother then cooperated without telling him, and then his brother gave him more information. Well, of course, I represented a Nigerian woman who was once indicted for, because she was the girlfriend of the leader. We debriefed, and the government says, you can't give us anything. I said, I told you that. She's just a girlfriend. She knows nothing. Luis Cedejo did not know what his brother knew, was not as involved as what his brother was, could not give the information that his brother gave. Even the other individual who was a leader, an organizer, a recruiter, Jose Angel Lopez, only got 120 months. Let me ask you, I want to just go back to the minor enhancement really quickly. Even if we followed the Alvarez case from the First Circuit, is there a distinction here because Quiroga got paid just to care for the hostages, Ms. Quiroga, whose home that the hostages were held at? I don't think so, because that's all Cedejo was paid for. All Cedejo did— Okay, but isn't that factually different from Alvarez, where everybody was just getting their share of the ransom as their payment, as opposed to a separate sort of room and board fee? The testimony in this case is that Mr. Cedejo received no money because it busted up too early, that he'd been involved in at least one other activity, and that's a dispute we have with the government, because the government won't say he was involved in four other, and there's no evidence of that. But he was paid $1,200 in the other case in which he was involved, in which he watched the individual illegal aliens who had been kidnapped for a period of five days. I think it makes the facts fairly identical, that just like the lady whose house this was, he was being paid to care for and treat— But isn't that factually different from Alvarez? That's my only question. Only if you think the housekeeper is different from the house guard. In that way, it would be. I'm talking about Ms. Quiroga, who apparently just got $500 to provide the sort of safe house, the stash house for these, the minor and others. And what I'm arguing is that that's exactly what Mr. Cedejo did. He was paid to care for the individual for a short period of time. I'm trying to distinguish from Alvarez, and I'm trying to distinguish between Quiroga and Cedejo. Okay. I'm asking you if that is a distinction, because the government made that argument. I'm trying to get your response to it. I don't believe they've made that argument, Your Honor. Okay. Maybe I misconstrued it, but that was mine. I may be wrong, but I— The last point, well, on the disparity, while the court granted this disparity argument, and the government says they've waived that point, too, but it's clear on the record that the defense lawyer objected on disparity grounds, on 355386 grounds. But the disparity was with his brother, as opposed to being an average participant among the others. And, of course, the case law is strong on that, that I may be wrong on that point. But, however, the real issue on that point is that if the court is with me, with Mr. Cedejo, as to the three points, the six points and the two points, then there was a sentencing error, and that procedural sentencing error occurred when he misapplied the calculation number on the sentencing guidelines, and that carried forward. And it tainted the rest of the sentencing, and, therefore, he should be given a new sentence. Thank you, Your Honor. We have reserved time for rebuttal. Thank you, sir. Ms. O'Malley? May it please the Court, my name is Terri Lee O'Malley. I represent the government in this criminal case. Mr. Cedejo raises four issues of sentencing error here on review. The parties do disagree about what the standard of review is, but the government submits that he cannot show error under any standard of review. Even in the face of the Alvarez case? Even in the face of the Alvarez case. Okay. So did you make the distinction that I was asking counsel about? Yes, Your Honor. Okay. Explain that to me, then. Yes, Your Honor. In the Alvarez case, the portion of money that was paid to any individual—actually, there was no money paid up front because it didn't come to fruition, but it was going to be a part of the ransom—there was also, in that case, as I recall, no actual instance the child going outside, really, of the care of the individual who had kidnapped the child. The government argues that Alvarez Cuevas is clearly distinguishable from this case on the plain language, and the plain language shows that, indeed, there was a minor, there's no issue there, there was money exchanged regarding the care of the minor. The minor was placed in the care of someone who had no legal right to the minor.  And that's Quiroga? That's Quiroga. Although— But, counsel, didn't Mr. Cedillo remain there the whole time? Mr. Cedillo could also fall into this category. I don't think that the plain language— So he could place her in the care of someone else but maintain care all at the same time? No. Mr. Juan Cedillo could place the child into another person's care, and that person could be Luis Cedillo or it could be Ms. Quiroga. Because Luis didn't participate in the actual grab. No, he did not. Not this one. Right. At this one. He was at the house with Quiroga taking care of the minor at Alvarez. Yes, Your Honor, that is correct. So in this case, and I believe that I did state in the brief that it is possible that other people could fall into that category. The cleanest version is Ms. Quiroga because she was not working for any portion of the ransom. In fact, it's not even clear that she realized this was hostage-taking rather than alien smuggling, which is a huge distinction in this case, and I don't know that I can stress it enough that Mr. Cedillo pled guilty to hostage-taking with ransom demand. He did not plead guilty to alien smuggling. Now, two of the issues that are up here, the minor victim being involved as well as the vulnerable victim enhancement, would both be decided if this were an alien smuggling case. But it isn't an alien smuggling case. This is a much more serious and depraved offense. Okay, and I want to ask you as we're talking about the minor victim about this standard of review issue. Is it enough to preserve error for the judge to say this might be an appellate issue and the person to say, yes, sir, or does there need to be more? No, Your Honor, I believe there needs to be more, and in this case, my opposing counsel said that what else could he say? Well, what he could say is, I object, Your Honor. That's what he could say. But counsel wasn't the judge, in fact, saying, I had this same issue come up this morning. I reviewed it. Well, I don't know whether it was this morning or not. I had it come up earlier today in his brother's case. I had it come up earlier today, I considered it, and this is the determination I've made on that issue. So the judge was saying I made a ruling. Now, I agree with you he could have said, and yes, Your Honor, I object to that ruling, but the fact is, I don't know that the judge was asking for any input. The judge was informing him, I had this same issue earlier today. This is my review of it, this is my analysis, and this is my ruling. Isn't that what happened? Yes, Your Honor. It's outside of the record here, but I did have access to the sentencing transcript for his brother, and the issue was discussed in some detail that morning. And isn't the point of the rule that says you've got to raise it before the district court in order to preserve it, isn't the point of that so that the district court has an opportunity to hear the objection and then to rule on it? Yes, Your Honor, but also, these are two different individuals who play two different roles, and that's part of the claim of error as well. It's not just whether this minor victim enhancement should apply to one defendant, but it's whether it should apply to Mr. Luis Cedillo. But should we consider this other transcript that no one has brought forth to us as part of the record here? No, Your Honor, it is outside of the record. I just wanted to... No, I know, you're answering the question, you're being honest, and I appreciate that, but I'm asking a different question. Should we consider, because I'm sure there are other sentencings going on all day long in a court, making all kinds of different arguments that the judge may become aware of law previously unknown. Are we to consider all that, or are we to consider the record of this sentencing? Your Honor, I believe we should consider the record of this sentencing. That's an obvious answer, and my question would only be, and this answer would be obvious, but isn't this one where the judge, in fact, as a part of their sentencing, referenced the earlier hearing? Isn't that what happened? Yes, Your Honor. All right. That is what happened. In this case also, I think there is a distinction in recognizing that counsel below did not even recognize that that enhancement had been implied. So he was not prepared to argue whether the enhancement should apply or not. He didn't even believe that it had been applied. Therefore, plain error should apply in this case. As far as the substantive matters regarding the minor enhancement, the government does argue that the plain text applies, that where the plain language is unambiguous, that's where it begins and ends. Okay. I'm trying to understand what we do with Alvarez, because it's another circuit's opinion. Even if we disagree with it, we're then creating a circuit split, so on and so forth. So I need to understand, is there a way in which we can accept the reasoning of Alvarez and still rule your way? Are you making that argument, that a ruling in your favor is consistent with Alvarez,  Your Honor, I believe that you can rule in the government's favor and still not quibble with Alvarez, because it is distinguishable. And it is distinguishable on the levels that we've discussed already. Most specifically, there was no money transferring from one person to another in Alvarez. That is completely different from this case. There was money all the way around. Individuals were paid specifically to care for the minor victim. So in that case, it is clearly distinguishable. If there are no further questions on the minor issue, I'll move to the vulnerable victim enhancement. In this case, the main point is that these individuals, whether we count the other, I think it was other 20, 15 individuals that were involved in relevant conduct, in this particular case, these 18 individuals were targeted specifically because of their inherent and their situational vulnerabilities as illegal aliens. And unlike a case such as in an alien smuggling case, where the fact that aliens are inherently vulnerable is taken into account by the base offense level, that is not the case with these victims. These victims were not only inherently vulnerable based on their lack of understanding of the language, their poverty, their fear of being deported or arrested, the fear of their families being deported or arrested. Which is why you might not report the kidnapping. Exactly, Your Honor. That's what makes them vulnerable is that, you know, if a United States citizen, John, is kidnapped, then his family is going to go to the police, whereas if, you know, undocumented alien John, who is not a citizen, is kidnapped, his family might be afraid because even if they find John, then John gets deported. Exactly. John gets deported and perhaps John's family gets deported as well because it would come to the attention, perhaps, that they were not legally in the country. Factors to consider are vulnerable victims are less able to resist. They are less likely, as you say, to report the crime. They also have an impaired capacity to both detect and prevent the crime. And that was particularly the case here, where these individuals were already at the mercy of one group of alien smugglers who had not yet transferred them to their destination. They might not have even known where they were. They certainly had no idea when this hostage-taking organization came in and said, we have to move you. They didn't even know it was a new group. They were completely, utterly vulnerable to anyone who would come in and say, we're going to keep you safe. We're going to keep you from being arrested. And then they were taken from one stash house to another, from one organization to another. They were economically appealing to the hostage-taking group because there were a number of them. There were 18 in one house. They were apparently not well-guarded, making them also vulnerable. Not their vulnerability specifically, but a situational vulnerability. So in this case, the government argues that the same argument that would apply to alien victims of alien smuggling simply does not apply here. Hostage-taking is a completely different offense. These particular victims were more vulnerable than other victims, as you say, who could have been taken in a hostage-taking situation. And the government submits that it was a more deprived or more depraved act because they took no risk. They simply stepped in to a group of individuals who were not guarded. They took them away into a situation, and then they held them hostage for more than they had already agreed to pay. For apparently, I believe the record said 2,500 individuals is what they started trying to extort out of the families. So for that reason, the government believes that the vulnerable victim enhancement should apply. All right. What do you make of this argument that Luis Cedillo should not have been treated the same as Juan Cedillo because at best he was an average participant, whereas Juan Cedillo was more of the, I don't know, the head of the whole plan? Your Honor, Luis Cedillo was an average participant in hostage-taking. He was not an average participant in alien smuggling. Yeah, but he's, your opponent, as I understand it, is saying not just comparing Luis to the other co-conspirators, but comparing Luis to Juan, Luis should get less than Juan. That's the question I'm asking about. Well, Your Honor, Juan actually had an agreement with the government, and it's only unwarranted disparities that are covered by Rule 3553A. And Congress has recognized that there are going to be some disparities that arise. The issue is whether they are warranted. And one of the disparities that Congress has set forth and accepted is for substantial assistance, which is how Mr. Cedillo's brother came to have a sentence of 180 months rather than 360 to life. The government also wants to point out here that this defendant, Luis, actually benefited by his brother's substantial assistance agreement with the government, despite the fact that he gave nothing of use. So if you look at this, his sentence, not only is there no disparity between, or unwarranted disparity between him and any other individual involved, either in alien smuggling or hostage-taking, but he was actually able to benefit from the substantial assistance motion without himself taking any risk. And I think it's important to note in this case that there were no other defendants who were similarly situated to Mr. Cedillo here. There were no other individuals other than his brother who pled guilty to hostage-taking rather than alien smuggling. And unlike his brother, Mr. Cedillo here did not provide substantial assistance to the government. Therefore, the unwarranted disparity just can't, I just don't think that you can see here that there was any other individual that he should have been compared to other than his brother. Okay. Anything else? Your Honor, if there are no further questions, I will cede my time. The government just asked that you will affirm the sentence. Thank you. Okay. Thank you. Mr. Cedillo had an eighth-grade education from Mexico. He has six children, had been in the United States since the year, illegally, since the year 2000. He had made a living for his family as a carpenter. All the evidence is he was led into this by his brother Juan. But aren't these exactly the arguments you make to a district court and the district court weighs and considers and makes a decision and gave a below-guidelines, at least as the court calculated the guidelines, sentence? And it's not really up to us to say, wow, he should have gotten a little more mercy and this and that. But let me start with Alvarez. The court said and asked the government, what do we do with Alvarez? If we make the same ruling as the First Circuit, do we have to reverse and send back for a new sentence? And our position, of course, is yes, you do. Even under the government's plain error, this would be plain error. There's error. It's substantial. It's in the best interest of the public. You're talking now about the minor enhancement. Yes. Which was a three-point. That's three points. So let's assume, Arguindo, that we agree with you that the minor's enhancement should not have been applied. If you take that off, aren't you down to a range of 262 months to 327 months? And I would agree with the court except for Gall and Abera, Luna, and Morales-Sanchez. And the reason for that is that when you misapply and you miss the sentencing guideline number, it takes the whole process. And so Gall says you reverse and you send it back, unless. Now there were earlier harmless error cases from the Fifth Circuit. But in those cases, the sentencing court always got the number right. This case, it pegged to 42. We say it's a 31. But whether it's a 31 or a 35 or a 38, he still got the number wrong. And so under Abera, Luna. You're saying he got the number wrong because the enhancement should not have applied. That's correct, Your Honor. I'm saying if we agree and then we get the right number, we're still at 262 to 327. But he got 180. Abera, Luna, Judge Higginbotham says that you must, the people who want to uphold that sentence must then, in order to have harmless error applied, which is what the court is talking about, that they must do two things. It's a very high burden. The district court, they must be able to show the district court would have imposed the very same sentence, one. Well, and two, and I'm going to apologize in advance for doing it, but this is one of those times where, again, the judge referred to the earlier sentencing. And it seemed to me, at least from reading the transcript, that he was very careful about this sentence based on what he had given Mr. Cedillo's brother. His brother got 180 marks. Is that right? Yes, Your Honor. And it just seemed to me that he wanted to make sure he didn't give any more than his brother, and more than anything else, your client's sentence seemed tied to what the brother got. And I apologize for referring to the earlier hearing, but all I'm saying is, it seems to me that the sentencing in this case, despite what may or may not have been an error in terms of the application of that enhancement, was tethered to his determination to ensure that your client got no more time than the brother got. And so, in that event, wouldn't the error be harmless, even if there were one? And I think the government's misargument for that is, he said, he shouldn't get any more than his brother. But they missed the second point of the error. There's two points, and they have both of them they have to do. The other one is that he would have used the same reason. And the reason before was, he shouldn't get twice as much. But if the number was lower, instead of 360, it was 195, would he have said, he should have gotten less than his brother? That's the second element of Yavarro, which the government cannot hold, cannot show, that if he had made the right sentencing guideline calculation, that he would have imposed it for the same reasons. They may be able to show that he would impose the same sentence, because he said, it should be the same as his brother. But it may have been for a different reason. They cannot show. And under, Judge Higginbotham says, you therefore must reverse and send it back for a new sentence. So I think if you rule in favor of Mr. Cedillo on Alvarez, then you must send it back for a new sentence. And U.S. Morales v. Sanchez, another Fifth Circuit case, says that the district court must correctly calculate the guideline, the applicable guideline. We pray that . . . Okay. Counsel, I know the time goes quickly. We appreciate your time. I see that you're court appointed. We appreciate your willingness to take the court appointment. Thank you. And thank you, counsel.